## Bailey, et al. v. Waddy, et al.

(Decided June 23, 1922.)

### Appeal from Shelby Circuit Court

1. Wills—Colleges and Universities—Devise for Education of Ministers.—A devise by one to an institution of learning establishing therein a chair "for the education of preachers of the simple gospel of our Lord and Savior through the teachings of the Bible in its simplicity and its integrity," and attaching thereto certain conditions requiring what shall be taught, which conditions are in accord with the beliefs of the managing authorities of the institution and are in accord with the views of a large number of the members of the church which controls and fosters the institution, even though the conditions imposed are not in harmony with the beliefs of certain other members of that church organization, will be upheld.

2. Charities.—Devise in Aid of.—Such a devise points out with reasonable certainty the purposes of the charity as required by the provisions of section 317 of the Kentucky Statutes.

3. Charities—Trusts.—Under the evidence it is shown that the educational institution in question is prepared to, and will teach, and is already teaching the doctrine announced in the decedent's will, and therefore it is not impossible to execute the trust.

4. Trusts—Equitable Trusts.—The foundation of the equitable rule that a trustee cannot purchase the trust property from himself or at his own sale is that equity will not uphold a transaction which creates a conflict between his interest as an individual and his integrity as trustee; but where the parties are all sui juris, all related, all thoroughly familiar with all the facts and circumstances, where no misstatement was made and no fact withheld, and they were all trying to reach a result favorable to the cestui que trust and such a result was actually reached, and good faith throughout the transaction is shown, a conveyance from the cestui que trust and her husband to the trustee individually for the trust property will be upheld.

5. Trusts—Cestui Qui trust.—While there always attaches to such a transaction between a trustee and a cestui que trust a presumption of invalidity, that presumption by clear evidence of good faith, of full knowledge, of adequate consideration, and of inde-

pendent thought, consent and action by the cestui qui trust, is overcome.

E. B. BEARD and GEORGE L. PICKETT for appellants.

WILLIS, TODD & BOND for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER.—Affirming.

Two questions are presented by this appeal:

First, whether certain devises in the will of George W. Waddy, deceased, to Milligan College, Tennessee, are void because of their uncertainty or because of the impossibility of performing them; and,

Second, whether a conveyance by George W. Waddy as trustee of Louise W. Bailey, in which conveyance Louise W. Bailey and her husband joined him as trustee, to George W. Waddy individually, is void, and whether his estate after his death still holds the property therein conveyed in trust for Louise W. Bailey under the terms and conditions of her mother's will just as George W. Waddy had theretofore held it.

Paragraphs 3, 4 and 5 of the will of George W. Waddy, deceased, present the first question and are as follows, to-wit:

"III. All the balance of my estate, real and personal of whatever kind, nature or character, not included in paragraph I and II above, I devise, give and bequeath unto Milligan College of Tennessee, an educational institution incorporated under the laws of the state of Tennessee, owned and controlled by the Church of Christ in that state, and located at Milligan College, Carter county, Tennessee, for the establishment of an educational fund or endowment to be known as the 'G. W. and Susie Waddy Memorial Fund.' for the support of the John W. McGarvey Bible Chair, which chair is hereby established and named; for the education of preachers of the simple gospel of our Lord and Savior through the teachings of the Bible in its simplicity and in its integrity and with the following conditions:

"(1) The said fund shall be securely invested, conserved and made a perpetual endowment, by said college, and interest or income thereof alone being available for the uses herein stipulated.

"(2) The credibility, inerrancy, infallibility, and the inspiration of the Holy Scriptures with their all suf-

ficiency in matters of faith shall be taught and their fundamental teachings emphasized especially the virgin birth of our Lord Jesus Christ, His perfect life, His infallible teachings, His death, burial and physical resurrection from Joseph's tomb; and His reappearance in fleshly form until the time of His ascension to Heaven; the universal prevalence of sin in the human race, and the full and free redemption therefrom through the blood of our Lord Jesus Christ; the commission to disciple all nations; the immersion of believers in Christ into water, and the necessity and importance of a new life hid with Christ in God; the teachings of the apostles pertaining to this life and the life to come, the resurrection from the dead and the final reward of the righteous and the punishment of the disobedient. It is further stipulated that the Bible itself shall be used as the text book and that before any professor or teacher shall be permitted to occupy this chair that he shall state to the trustee of this fund in writing his perfect willingness to teach the same with earnestness and energy.

"IV. After my death and during the life of my wife, Mrs. Erma B. Waddy, I direct that a sum equal to the annual interest on the said fund at a rate of five per centum be paid on the first day of January each year, to the said Mrs. Erma B. Waddy until her death or remarriage, the interest to be paid to Mrs. Erma B. Waddy. To insure the prompt and faithful payment of the above stipulated interest from this fund to the above-named Mrs. Erma B. Waddy, the trustees of Milligan College shall before taking possession of this fund, execute and deliver to the aforesaid Mrs. Erma B. Waddy, in the penalty of an amount equal to the sum to be turned over to Milligan College, conditioned to faithfully pay over said interest as hereinbefore stated.

"V. All the remainder and residue of my property, or whatever kind or nature, of which I may die seized and possessed I hereby give, devise and bequeath unto said Milligan College of Tennessee, for the uses and purposes and subject to the conditions set out in paragraph III and IV, hereinbefore."

George W. Waddy died childless, and this action was instituted by certain of his heirs-at-law seeking to have the devise referred to in these three quoted paragraphs declared to be null and void, and that his heirs-at-law be adjudged to be the owners of such property as undevised

estate. A trust company was designated in his will as executor, but having declined to act as such, his widow was by the county court appointed administratrix with the will annexed.

The contention is, not that the certainty of the beneficiaries is not specifically set forth in this devise, but that the purposes of the charity created thereby are not set forth with reasonable certainty, and under our statute, therefore, the devise is void. And, further, that the execution of this devise is impossible of performance because under modern conditions and in the light of modern progressive ideas, the things which he requires to be taught cannot and will not be taught and promulgated in any conscientious institution or by any self-respecting professor.

The evidence discloses—a fact generally known—that for a number of years there has existed in the Christian church, of which decedent was a member, a controversy between what are known as the progressive and the conservative wings of that church, the one insisting upon what may be termed a modern or progressive interpretation of certain provisions of the Bible, and the other adhering to the older or what may be termed conservative or literal interpretation, the latter supposed to have been generally accepted in the earlier days of that denomination.

It is apparent from the quoted provisions of the will that decedent belonged to the latter class, and that this charity was created by him in his will in the light of his conservative views on these subjects, and for the purpose of having those views taught and promulgated with the income from the property so devised in trust. Having, as he plainly must have had, very decided views upon the subjects treated of, it seems plain that he had sought to find an institution of learning supported and fostered by the church to which he belonged, which was operated and controlled by persons having views similar to his own; and although it appears in the evidence that he had never been to Milligan College, it is fair to assume that he had investigated that institution and had satisfied himself it was conducted by and controlled by persons in his church who were in sympathy with his conservative views, and for that reason selected that institution as the beneficiary of his devise because he believed from his investigation it would and could carry out better than some other the ideas expressed in his will.

It is in evidence by an ex-president of Milligan College after an examination of the provisions of the Waddy will, that the institution is now fitted and qualified to teach the things which decedent therein directs to be taught, and that he believes that institution is prepared to carry out the terms of the bequest; that while there is a difference in the views of ministers of the Christian church, and they do not all teach the credibility, inerrancy, infallibility and the inspiration of the Holy Scriptures, it is a matter of individual opinion and interpretation among them, and there has been no split or cleavage in the church on that account, but that the teachings in Milligan College are thoroughly conservative and in harmony with the conservative view.

The present president of Milligan College also testified he had read the provisions of the Waddy will and that they were absolutely consistent with the teachings of Milligan College, and that the institution was able and willing to teach the doctrines therein enunciated and is doing the same now; that Bethany College was the birthplace of the Christian church and from an interview with the president of that institution he sees no difference in its teachings and those of Milligan College, and that the present board of trustees of the latter institution believed as Mr. Waddy believed as expressed in the provisions of his will; that the Bible is the main text book used in teaching ministerial students at Milligan College, although various other commentaries are referred to, and that Milligan College is so organized as to insure the permanency of the views of the present board of trustees.

So that it is plain Mr. Waddy selected an institution in which to endow a chair where ministerial students would be taught the things in which he believed, and where there would be carried out the ideas which he had and expressed. It seems clear that the will was written in the light of these differences of opinion between members of the Christian church, and it is apparent that the fundamental idea in the testator's mind was to create a trust fund to be used in such manner as to teach and carry forward the things in which he so ardently believed.

From these considerations it cannot be said that he has failed to point out accurately and correctly the purposes of this trust; his purpose manifestly was to encourage, aid and assist those members of his church in teaching a doctrine in which he and they believed, as dis-

tinguished from certain views which other members of that church held.

Our statute on charitable uses and religious societies (section 317) provides that such devises

"Shall be valid, if the grant, conveyance, devise, gift appointment, or assignment shall point out with reasonable certainty the purposes of the charity and the beneficiaries thereof."

It cannot be said with any degree of reason that the language in this will has not pointed out with reasonable certainty the purposes of the creation of this trust; on the contrary it may be said that he has with unusual clarity, even though possibly with the use of too many words, elucidated the differences of opinion among the members of the different wings of his church, and has made it certain the wing to which he belonged and the beliefs which he held as forming the basis of the purposes of the trust.

The property was his own, his beliefs were evidently deep-rooted and conscientiously held, and it is plain he had the one controlling view in creating this trust of aiding and assisting those in his own church who held views similar to his own to teach ministerial students along the line of thought expressed by him in his will, and thereby, as he believed, bring about the dissemination of such views.

We are of opinion, therefore, that the will pointed out with reasonable certainty his purposes in creating the trust.

Appellant relies upon the case of Spalding v. St. Joseph Industrial School, 107 Ky. 382, but the devise in that case was nothing like the one we are dealing with. There the devise was "for charitable objects, to be expended for said objects in this diocese of Louisville, according to his (the executor's) discretion;" while here the devise is to an established college for the support of a chair established therein "for the education of preachers of the simple gospel of our Lord and Savior through the teachings of the Bible in its simplicity and in its integrity."

In the Spalding case the devise was declared invalid because it selected no class or individual which can be considered charitable, and because "we are constrained to the conclusion it amounts to nothing more than a power of attorney to make a will for the testator, and that

cannot be done in Kentucky.'' But, in this case the testator points out with unusual precision the class of persons who are to be the beneficiaries of the income from the trust estate as ministerial students who are to be taught the gospel according to the terms of his will and in the manner therein designated.

The question as to the practicability of the enforcement of the terms of this trust have not yet arisen and are not now up for consideration. We are not called upon to speculate as to what might happen in the future if the authorities of Milligan College should change their views on these questions, or if that institution should fall into the hands of persons having contrary views and should therefore attempt to use the income from this fund in a manner contrary to that prescribed by the testator. Such questions have not yet and may never arise; they are purely speculative; but if such things should arise it will then be time to consider them.

Plainly this trust so created is not impossible of performance; we have an educational institution which is the beneficiary of this trust, already in existence and already teaching the self-same doctrine which the testator requires shall be taught in the chair which he establishes in that institution.

The testator wrote his own will, and while he has used some expressions which possibly one more familiar with the doctrinal differences between the two wings of the church to which he belonged, would not have used, yet it is perfectly plain that he was an ardent supporter of and believer in the conservative views entertained by some members of that church, and desired to create this trust for the purpose of educating ministerial students to believe in those conservative doctrines and who would thereafter disseminate them, and we entertain no doubt that the purposes of the charity were pointed out by him with reasonable certainty and that it is entirely practicable under existing conditions to execute the trust.

2. Maria L. Waddy was the mother of George W. and T. M. Waddy and of appellant Louise W. Bailey. In 1907 she made and published her will which was, in March, 1908, admitted to probate.

The seventh clause of that will is as follows:

''7th. I will, devise and bequeath share and share alike in my farm known as the Dr. Robert Thurston's farm (or share and share alike in the proceeds arising

from the sale thereof, if in the discretion of my executor
if he thinks best to sell the farm in order to a more equit-
able division) to my sons Geo. W. Waddy and Thompson
M. Waddy and to my daughter Maria Louise Bailey.
The share falling to Maria Louise Bailey I will for sole
and separate use and benefit of said Maria Louise Bailey,
free from the debts of her husband, Landon Bailey, and
not to be liable for the payments of any note or notes
which she may have signed prior to this date. And be-
cause of my great love and abiding affection for my be-
loved daughter, the said Maria Louise Bailey, I give and
devise her said interest in the Thurston farm to my execu-
tor to be held by him in trust, for the sole use, benefit and
enjoyment of said Maria Louise Bailey, to be controlled,
managed and handled by my said executor as he thinks
is for the best interest of said Maria Louise Bailey.
Before entering upon the discharge of the aforesaid trust,
my executor shall be required to execute a good and ac-
ceptable bond for the faithful administration and per-
formance of said trust. If, however, if my said executor
should decline to accept the aforesaid trust, I hereby em-
power him to select and appoint a suitable trustee of
whom good security shall be required.''

Under the terms of that instrument George W. Waddy
qualified as trustee for his sister, Mrs. Bailey, and con-
tinued to act as such until his death in June, 1917. On
the 27th of September, 1909, Mrs. Bailey and her hus-
band joined in a deed with George W. Waddy, as execu-
tor and trustee under the will of Maria L. Waddy, to
George W. Waddy to the undivided one-third interest
of Mrs. Bailey in and to the Dr. Thurston tract of land
referred to in item seven of the will of Maria L. Waddy.
The consideration for the conveyance was twenty-five
hundred dollars, which was by George W. Waddy paid
to the holder of a mortgage on other property of Louise
Bailey not embraced in the trust.

In this action, begun in March, 1918, after the death
of George W. Waddy, and eight and one-half years
after the deed in question was made and executed, and
after George W. Waddy and his estate had been in pos-
session of the land conveyed to him for that length of
time, and after the trust proceeds had been reinvested in
other land which, in turn, had been sold at a handsome
profit, it is sought to have that instrument declared to be
null and void and that the estate of George W. Waddy
still holds the same in trust for Louise W. Bailey.

The facts as shown by the deeds in the record are that in November, 1892, W. L. Waddy and others conveyed jointly to Landon T. Bailey and Louise Bailey, his wife, three hundred and seventy-one and a fraction acres of land in Shelby county, no part of which is embraced in the trust created by the will of Maria L. Waddy. That conveyance is made

"One-half thereof to the said Landon T. Bailey and one-half undivided thereof which is to contain all the buildings and improvements unto the said Louise Bailey as her sole and separate estate and to be for sole and separate use and benefit, free from the debts, control or interference of her said husband or any husband she may hereafter have. It is distinctly understood that the value of the buildings and improvements (which are aforementioned on the said Louise Bailey) are not to be considered in allotting the said Louise Bailey her half of said land."

Prior to the 19th of September, 1905, Landon Bailey and his wife conveyed two different tracts off of the three hundred and seventy-one hundred acre tract to C. A. and E. R. McCormick, leaving of the three hundred and seventy-one acre tract about one hundred and fifty-nine acres. Then, on the 15th day of September, 1905, they joined in a mortgage to Mrs. Bettie Neel on this one hundred and fifty-nine acres for the sum of three thousand six hundred and twenty-five dollars and thirty-seven cents, which one hundred and fifty-nine acres embraced all the improvements referred to in the deed of W. L. Waddy and others to Landon and Louise Bailey jointly, wherein it was expressly stipulated, as above quoted, that her part was to contain all the buildings and improvements and that the value of the buildings and improvements was not to be considered in allotting her one-half thereof.

In 1909, when George W. Waddy bought from his sister and she and her husband conveyed to him her one-third interest in the Thurston farm, which she took under the will of her mother, this mortgage executed by Mr. and Mrs. Bailey on the one hundred and fifty-nine acres, including the improvements, remained largely unpaid, and George W. Waddy by and with the consent of Mr. and Mrs. Bailey paid the twenty-five hundred dollars, which was the consideration for her part of the Thurston land, on the mortgage which Mrs. Neel held on the one hundred and fifty-nine acres which was not embraced in

the trust, and then Mr. and Mrs. Bailey joined in a conveyance to George W. Waddy as trustee of Louise Bailey for fifty acres of the one hundred and fifty-nine acres, which fifty acres embraced all the improvements, and which, under the terms of the deed under which Landon and Louise Bailey held, was the property of Louise Bailey.

By this action the trustee released the mortgage on the home where his sister and *cestui que trust* lived, and, doubtless at their urgent insistence, and that property which was hers free from any trust was voluntarily by her and her husband placed in trust under the terms of her mother's will in lieu of her interest in the Thurston farm. In other words, by agreement between the trustee and the *cestui que trust* and her husband the trustee bought her trust property and applied the money to the payment of a mortgage on her home, which was not in trust, and they all voluntarily placed the home property in trust in lieu of the other trust property. It seems reasonably clear that the arrangement was made for the purpose of saving the home for the *cestui que trust,* and possibly preventing the foreclosure of a mortgage thereon and a sacrifice of it. The weight of the evidence unmistakably is that in 1909, at the time of this transaction the price paid for her interest in the trust property by George W. Waddy was a fair and reasonable price; that the transaction between him and his sister and her husband was open, fair and above suspicion; that there was no concealment or misrepresentation, that all the parties knew all the facts, that the reinvestment of the twenty-five hundred dollars which George W. Waddy paid for her interest in the Thurston land was made in her other lands under the conditions above set forth.

Thereafter, on March 5, 1914, George W. Waddy as trustee joined in a deed with Mrs. Bailey and her husband to J. S. Franklin for this one hundred and fifty-nine acres of land, which embraced the fifty acres conveyed by Mr. and Mrs. Bailey to him as trustee in substitution for her interest in the Thurston land, and the proceeds to the extent of thirty-seven hundred and fifty dollars was paid to George W. Waddy as trustee for Louise Bailey; in other words, he as trustee sold and received for the trust property which had been substituted voluntarily for the original trust property thirty-seven hundred and fifty dollars when he had only paid for the original trust property twenty-five hundred dollars. So that the rein-

vestment of the twenty-five hundred dollars netted a handsome profit to the *cestui que trust*.

Between 1909, when the trust property was conveyed to George W. Waddy, and 1918, when this suit was filed seeking to have it adjudged that his estate held the property in trust for Mrs. Bailey, there was an abnormal increase in the value of agricultural lands brought about by conditions growing out of the world war, and the contention after that length of time and after the unusual change in conditions is that George W. Waddy as trustee had no right to convey to himself as an individual the property of his *cestui que trust,* and his attempt so to do passed no title, and therefore his estate now holds that same property, which has increased so abnormally in value, for the benefit of the *cestui que trust*. At the time of the transaction in 1909, both Mr. and Mrs. Bailey were *sui juris,* they were each intelligent business people, and the record shows that Mr. Bailey, especially, was a keen, alert, active business man. There is no claim that they were not familiar with all the facts, there is no claim that any misrepresentation was made to them or that any material fact was withheld from them; but they claim only that at the time of the transaction George W. Waddy gave them to understand or intimated to them that, *as he had no children,* the Thurston property would revert to his heirs, of whom Mrs. Bailey was one, but the competent evidence in the record fails even to substantiate this. In this case the trustee did not purchase the property from himself as trustee, although he nominally joined in the deed from the *cestui que trust* and her husband to himself. What he actually did was to buy the property from the *cestui que trust,* and take from her and her husband a conveyance therefor. If he had as trustee merely conveyed the property to himself individually without the *cestui que trust* joining, unmistakably it would be a purchase from himself and the *cestui que trust* would have the right either to treat his purchase from himself as a continuation of the trust, or if he sold the trust property at an advanced price, to adopt the sale and claim the whole purchase price.

The foundation of the equitable rule that a trustee cannot purchase from himself or at his own sale is that equity will not uphold a transaction which creates a conflict between his interest as an individual and his integrity as trustee. Under the facts of this case the transaction created no such conflict; the parties were all *sui*

*juris,* they were all related, they were all thoroughly familiar with all the facts and circumstances, no misstatement was made and no fact withheld, and they were all trying to reach a result favorable to the *cestui que trust,* and such a result was actually reached.

Where the parties are *sui juris* and the trustee purchases the trust property from the *cestui que trust* and the parties are dealing at arm's length, and there is no concealment of fact or misrepresentation or overreaching, the transaction will be upheld.

It is pointed out in the case of Price v. Thompson, 84 Ky. 219, that there are two classes of cases growing out of the purchase by a trustee of trust property from the *cestui que trust,* or at a sale of trust property held by the trustee, and it is held those two classes of cases are controlled by different special rules.

The two special classes are therein stated to be:

"The first class includes all those instances in which the fiduciary, and those with whom he stands in that relation, consciously and intentionally deal with each other, each knowingly taking a part in the transaction from which results a contract or conveyance. Here the contract is not necessarily voidable; it may be valid, but a presumption of its invalidity arises, and that so strong that nothing short of clear evidence of good faith, of full knowledge, of adequate consideration, and of independent thought, consent and action, can overcome it.

"The second class is where the fiduciary, acting with reference to his trust, deals with himself in his private or individual character, as where an agent to sell sells the property to himself, or a sheriff buys the property at his own sale. Such transactions are always voidable at the suit of the party concerned. They are not merely presumptively invalid, as in the first class, where good faith, full knowledge, adequate consideration, independent thought, consent and action may be proved, because the sale or purchase, if made privately, is not known; or if made publicly, by coercive authority cannot be controlled; therefore, the good faith, full knowledge, etc., do not control. For these reasons the presumption of invalidity in the first class is rebuttable, and the presumption of invalidity in the secord class is conclusive. (Pomery's Equity Jurisprudence, vol. 3, sections 956, 957.)"

That classification and the rules there laid down governing the different classes of cases have been referred

to and approved several times by this court, notably in the recent case of Clay v. Thomas, 178 Ky. 199.

Manifestly, this case comes within the first class above designated and was such a conveyance as will be held valid upon the overcoming of the presumption of invalidity, and upon the presentation of clear evidence of good faith, of full knowledge of all parties, of adequate consideration and independent thought, action and consent by all parties. Our statement of the facts in this opinion must be convincing of the utmost good faith of all parties in the transaction of 1909 wherein Bailey and his wife conveyed her interest in the trust property to the trustee; it must be convincing that all parties fully knew and understood the transaction and all of the facts and circumstances surrounding it, and while there is a conflict of evidence as to the value of the interest in 1909 the decided weight of the testimony is that the price was at that time a fair and reasonable one; nor can there be any doubt that the sale and conveyance to George W. Waddy by Mrs. Bailey and her husband was made as the result of independent thought and action upon their part, and as the record tends to show for the purpose of releasing a lien upon her home.

Recognizing that the burden was on appellees to show the utmost good faith and to convince the chancellor that there were no suspicious circumstances or conditions surrounding the transaction, we, without hesitation, say from the record they have fully met that burden, and we are convinced from the very beginning the whole transaction was had primarily for the benefit of the *cestui que trust* and for the purpose of saving her home from subjection to a mortgage debt, and resulted to her financial benefit.

The record shows that throughout the long years her brother acted as her trustee and managed the trust property, he made many settlements and exercised good business judgment, and never charged his sister one cent for all those years' work. We entertain no doubt from the record that the parties were all at the time actuated by the best motives.

The judgment is in accord with these views, and is, therefore, affirmed.